1  SCOTT BONAGOFSKY (SBN: 190255)
2  ELIZABETH R. WEISS (SBN: 209181)
   BONAGOFSKY & WEISS
3  1 Market Street, Steuart Tower, Suite 1600
   San Francisco, CA 94105
   Tel: (415) 882-1555
4  Fax: (415) 882-1551

5  KATHRYN BURKETT DICKSON (SBN: 70636)
   DICKSON LEVY VINICK BURRELL HYAMS LLP
6  180 Grand Avenue, Suite 1300
   Oakland, CA 94612
7  Tel:  (510) 318-7700
   Fax:  (510) 318-7701
8

9  Attorneys for Plaintiffs MICHAEL RUHE and VICENTE CATALA

```
FILED
CLERK, U.S. DISTRICT COURT

MAY 13 2011

CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY
```

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

SACV11-00734 CJC  MLGx

13  MICHAEL RUHE, and            Case No.:
    VICENTE CATALA,
14                               COMPLAINT FOR:  (1)
                                 CONSTRUCTIVE DISCHARGE IN
15          Plaintiffs,          VIOLATION OF THE DODD-FRANK
                                 WALL STREET REFORM AND
16      vs.                      CONSUMER PROTECTION ACT OF
                                 2010, 15 U.S.C. §78u-6(h); (2)
17  MASIMO CORPORATION, and DOES 1 to   CONSTRUCTIVE DISCHARGE IN
    100, inclusive,             VIOLATION OF PUBLIC POLICY; (3)
18                               UNFAIR COMPETITION (BUSINESS
          Defendants.           & PROFESSIONS CODE SECTION
19                               17200); (4) DECLARATORY RELIEF
                                 REGARDING VALIDITY OF
20                               ARBITRATION AGREEMENTS

21                               DEMAND FOR JURY TRIAL

22

23      Plaintiffs MICHAEL RUHE and VICENTE CATALA (hereinafter "RUHE" and

24  "CATALA," and collectively, "Plaintiffs") bring this action against Defendant MASIMO

25  CORPORATION (hereinafter "MASIMO"), and Does 1 to 100, inclusive, for damages resulting

26  from Defendants' unlawful conduct, and therefore allege as follows:

27                              INTRODUCTION

28      Plaintiffs are medical device sales representatives (known as "Territory Managers" or

                                     1

1   "TMs") who used to work for Defendant MASIMO.  In October 2010, Plaintiffs RUHE and

2   CATALA were compelled to resign their employment with MASIMO because MASIMO

3   engaged in illegal activity, including but not limited to:

4          (a)    pressuring TMs to sell medical devices that MASIMO and the TMs knew to be

5                defective, and to deceive physicians about the devices' lack of accuracy and other

6                problems;

7          (b)    repeatedly threatening and harassing TMs who raised issues about

8                misrepresentations and improper sales tactics, by stating, for example, that they

9                needed to either "get on board" or quit their jobs;

10        (c)    berating and criticizing TMs who reported device inaccuracies and malfunctions;

11        (d)    violating public policies applicable to medical device TMs;

12        (e)    participating in rigged clinical studies designed by MASIMO to exclude results

13               outside of MASIMO's claimed accuracy specifications for the devices, and only

14               reporting results within the accuracy specifications;

15        (f)    obtaining patients' private health information from the patients' physicians for

16               MASIMO's own use, without patient knowledge or consent; and

17        (g)    hiding a self-imposed recall on one of its devices from the United States Food &

18               Drug Administration ("FDA").

19     MASIMO is a publicly traded medical device manufacturer whose pulse oximetry

20   devices are known throughout the medical industry as the "gold standard" for measuring oxygen

21   saturation in hemoglobin (a protein in the blood that carries oxygen from the lungs to body

22   tissues, and carbon dioxide from those tissues back to the lungs).  Not all of MASIMO's medical

23   devices enjoy "gold standard" status within the medical industry, however.

24     MASIMO's apparent "next big thing," as evidenced by its aggressive marketing and

25   investment in sales personnel, as well as by the dominant position the new product line occupies

26   on MASIMO's website home page, is its technology for non-invasive measurement of

27   hemoglobin levels in a patient's blood.  The hemoglobin measurement is a frequently ordered

28   test in hospitals, emergency rooms, surgical centers, physicians' offices (especially family

1    practitioners, pediatricians, and OB/GYNs), and nephrology clinics.  It is reimbursed by

2    government programs such as Medicare and by many private insurance plans.

3         The biggest "sticking point" – literally – when ordering a hemoglobin test is the fact that

4    the patient needs to have blood drawn with a needle.  While this is usually not a major problem

5    for a patient who needs a hemoglobin test, it can be painful and the lab results take time to

6    process.  MASIMO's non-invasive hemoglobin devices were conceived to eliminate these

7    problems by reading a patient's hemoglobin level using a finger sensor that projects red and

8    infrared light through a patient's skin, providing a result in under a minute.  The idea of a non-

9    invasive method for measuring hemoglobin is especially attractive to pediatricians, whose infant

10   and toddler patients (and oftentimes their parents) have an aversion to needles, and to medical

11   practices where patients are having hemoglobin levels checked frequently.

12        MASIMO has been in a race with other medical device manufacturers to be the first to

13   bring to market a non-invasive hemoglobin <u>spot checking</u> device (i.e., a device that takes a

14   single reading after measuring hemoglobin levels for 45-90 seconds).  In May 2008, MASIMO

15   obtained FDA approval for the *Radical-7*, a device that measures total hemoglobin (designated

16   by the MASIMO trademark "SpHb"), pulse oximetry (designated as "SpO2"), pulse rate,

17   perfusion index, and other measurements on a <u>continuous</u> basis (multiple readings over a period

18   of time, such as during or after a surgical procedure to monitor blood loss or to detect internal

19   bleeding post-surgery).

20        MASIMO used its FDA approval of the Radical-7 to obtain speedy FDA approval of its

21   hemoglobin spot checking devices, including the *RadCheck* in October 2008 and the *Pronto* in

22   July 2009.  To obtain this approval, MASIMO represented to the FDA that the RadCheck and

23   the Pronto were "substantially equivalent" to the predicate device, meaning that it was "the same

24   in design, principles of operation, materials, and performance to the predicate device."

25   MASIMO also fraudulently represented to the FDA that the Pronto met the following accuracy

26   specifications when measuring total hemoglobin:

27        • **within +/- 1 g/dL** (grams of hemoglobin per deciliter of blood) **of a verified lab**

28             **result at the first standard deviation** (68% of the time);

- **within +/- 2 g/dL of a verified lab result at the second standard deviation** (95% of the time);
- **within +/- 3 g/dL of a verified lab result at the third standard deviation** (99.3% of the time);  and
- **more than +/- 3 g/dL off of a verified lab result at the fourth standard deviation** (the remaining 0.7% of the time).

A "normal" hemoglobin reading in an adult would be between 12 to 16 g/dL.  By way of illustration, if an adult's lab-verified hemoglobin level were at 13 g/dL, MASIMO claimed that its Pronto device measurement would be accurate to within 1 g/dL of this measurement (i.e., Pronto would give a reading between 12 g/dL and 14 g/dL) 68% of the time.  MASIMO claims that Pronto is accurate to within 2 g/dL of a verified lab result 95% of the time, and accurate to within 3 g/dL of a verified lab result 99.3% of the time.

In reality, the Pronto's performance was nowhere near MASIMO's claimed accuracy specification.

MASIMO also used its FDA approval of the Radical-7 and the Pronto to obtain speedy FDA approval of a new hemoglobin spot checking device, the *Pronto-7*, by fraudulently representing to the FDA that the Pronto-7 was substantially equivalent to the predicate device, the Pronto.  This was false because the Pronto-7 did not have a functional pulse oximetry ("SpO2") sensor for rendering an SpO2 measurement, as did the Pronto, and as required by the FDA in order to designate the device as substantially equivalent to the predicate device. MASIMO also fraudulently represented to the FDA that the Pronto-7 met the claimed accuracy specification of the predicate devices, which it did not.

Once MASIMO obtained approval from the FDA to market the Pronto and the Pronto-7, MASIMO rushed the devices to market even though complaints were pouring in from TMs, customers, and attendees at trade shows regarding the wild inaccuracy of the devices when reading SpHb, which was the primary function of the devices.  Plaintiffs are informed and believe, based on statements made by MASIMO CEO Joe Kiani, that MASIMO did so because Kiani wanted to be the first company in the market with a non-invasive, spot checking

1    hemoglobin device, and he was aware that another competitor, OrSense, had a competing device

2    that was awaiting FDA approval.

3          MASIMO used its reputation as the "gold standard" for *pulse oximetry* measuring

4    devices to convince potential buyers that its *non-invasive hemoglobin* products were of equal

5    quality.  Knowing that its products did not work as advertised, MASIMO nonetheless went to

6    great lengths to get these devices into as many physicians' offices and hospitals as possible.

7    MASIMO provided free trials of the Pronto and Pronto-7 to physicians, and encouraged the

8    physicians to seek reimbursement for such uses through fraudulent Medicare charges.  Despite

9    numerous and continuing reports concerning wildly inaccurate readings, MASIMO took the "sell

10   at all costs" approach, which included instructing TMs to lie about the accuracy of the devices,

11   manipulating or hiding clinical data to make the devices appear more accurate than they were,

12   instructing TMs to pay physicians under the table to push sales of the devices, and falsely stating

13   that the testing done by the devices was reimbursable under the Child Health and Disability

14   Prevention Program ("CHDP"), a program funded with state and federal taxpayer dollars.

15         MASIMO was aware that the Pronto and Pronto-7 devices had the potential to cause

16   serious misdiagnoses of patients, which could lead to injury, aggravated illness, or even death, in

17   the case of, for example, a severely anemic patient or an internally bleeding, post-surgical patient

18   who received a "normal" result from one of the devices.  MASIMO knew that once it put the

19   Pronto, Pronto-7, and Radical-7 devices in physicians' offices and in hospitals, physicians would

20   use readings from the devices to watch for blood loss, to make patient diagnoses, and to

21   determine treatment such as blood transfusions, iron supplements, and drug dosing.  Despite the

22   fact that each device raised serious and repeated questions concerning safety and efficacy during

23   the premarket stage, because MASIMO refused to report known problems truthfully and

24   completely to the FDA, the Pronto and Pronto-7 devices received FDA approval.

25         From the start, virtually all of MASIMO's TMs who were tasked with selling the original

26   Pronto devices complained of device inaccuracies, and later, provided MASIMO management

27   with "1022 forms" of product malfunctions and continually expressed concerns verbally about

28   the devices.  The 1022 forms were internal MASIMO forms used to record customer feedback

1   regarding complaints, device malfunctions, or product improvement suggestions.  At first,

2   MASIMO management made excuses for the accuracy problems, but eventually began to admit

3   problems, at least internally, as complaints of inaccuracies mounted and customers asked to

4   return devices.  Instead of pulling the devices until it could fix the problems, MASIMO

5   management continued to invent fanciful excuses for the devices' malfunction and instructed its

6   TMs to use these excuses when faced with physicians who were complaining about the devices.

7   These excuses for device inaccuracies included improper lighting in the examination room,

8   TMs' operating error, ambient and hand temperature, altitude, and cell phone/electrical

9   interference.

10        All of these excuses were designed to hide the problem, which was that the devices

11   simply did not work.  Knowing that the devices did not work, MASIMO failed to fix the devices

12   and failed to report device malfunctions to the FDA.  As complaints continued to mount, forcing

13   MASIMO to address the problem in some manner, MASIMO voluntarily recalled the Pronto in

14   mid-2009.

15        Unfortunately, MASIMO was more concerned with the consequences of having to report

16   this self-imposed recall to the FDA than it was with the consequences of keeping these

17   potentially dangerous devices in the market.  MASIMO instructed each TM to return at least one

18   faulty device to at least one physician in their territory in an attempt to justify the company's

19   refusal to notify the FDA of the recall.  Without fixing the accuracy problems, MASIMO began

20   selling the Pronto device again approximately eight months later, while waiting for the Pronto-7

21   to be approved by the FDA.

22        Virtually every TM MASIMO hired to sell the Pronto and Pronto-7 has complained

23   repeatedly and consistently about the inaccuracy of the devices.  TM Heidi Hawkins apparently

24   made the mistake of complaining a bit too vocally in front of several members of MASIMO's

25   upper management at the Pronto-7 launch meeting in July 2010.  Plaintiffs are informed and

26   believe that she was promptly placed on a Performance Improvement Plan, was given an

27   impossible sales quota that none of the TMs at MASIMO met, and then was terminated by

28   MASIMO on August 31, 2010, in retaliation for her complaints about the MASIMO's fraudulent

1  marketing practices and the wild inaccuracy of the devices.

2       As the months went by and it became clear that MASIMO could not fix the accuracy

3  problems and would not keep the Pronto and Pronto-7 devices off the market until such time as

4  the devices were as accurate as MASIMO was representing to physicians who would use the

5  devices to make health care decisions, Plaintiffs MICHAEL RUHE and VICENTE CATALA

6  were compelled to resign their employment with MASIMO in October 2010, and in doing so,

7  walked away from lucrative employment, into the worst job market of the past 70 years, at great

8  financial and psychological sacrifice for both of them.

9           ·  **JURISDICTION AND VENUE**

10      1.    This Court has jurisdiction to hear this action pursuant to 28 U.S.C. section 1331

11  because this action arises under the laws of the United States, including 15 U.S.C. section 78; 18

12  U.S.C. section 1514A; and 31 U.S.C. section 3130(h).

13      2.    The claims involved in this action arose in the Central District of California, in

14  that many of the events described in this complaint occurred within this judicial district.

15  Defendant MASIMO owns and operates facilities within this judicial district, and both Plaintiffs'

16  territories included geographical locations within this judicial district.

17      3.    This Court has pendant and supplemental jurisdiction over Plaintiffs' state law

18  tort and statutory claims pursuant to 28 U.S.C. section 1367.  Compensatory and punitive

19  damages, attorneys' fees, and costs, as well as injunctive and equitable relief are sought pursuant

20  to both the federal and California provisions providing for such remedies.

21                     **PARTIES**

22      4.    Plaintiff RUHE is an adult individual residing in San Diego, California.

23      5.    Plaintiff CATALA is an adult individual residing in Los Angeles, California.

24      6.    Plaintiffs are informed and believe and thereupon allege that Defendant

25  MASIMO is, and was at all times relevant herein, a corporation organized and existing under the

26  laws of the State of Delaware, with its principal place of business in Irvine, California.

27      7.    Plaintiffs are ignorant of the true names and/or capacities of the defendants sued

28  herein as Does 1 through 100, inclusive, and therefore sue these defendants by such fictitious

COMPLAINT

1    names pursuant to Code of Civil Procedure Section 474.  Plaintiffs will amend this Complaint to

2    allege their true names and capacities when ascertained.  Each fictitiously-named defendant is

3    responsible in some manner for the occurrences alleged herein, and Plaintiffs are entitled to the

4    relief requested herein against each such fictitiously-named defendant.

5         8.      Plaintiffs are informed and believe and thereupon allege that, at all times material

6    herein, each of the specifically named and DOE defendants was the agent of, employee of,

7    and/or working in concert with, his or her co-defendants and was acting within the course and

8    scope of such agency, employment and/or concerted activity.  To the extent that certain acts and

9    omissions were perpetrated by certain defendants, the remaining defendant or defendants

10   authorized, confirmed and/or ratified said acts and omissions.

11        9.      Whenever and wherever reference is made in this Complaint to any act by, or

12   failure to act of, a defendant or defendants, such allegations and reference shall also be deemed

13   to mean the acts and failures to act of each defendant acting individually, jointly, and severally,

14   unless stated otherwise.

15        10.     Whenever and wherever reference is made to individuals who are not named as a

16   plaintiff or as defendants in this Complaint but were who employees and/or agents of Defendant

17   MASIMO, such individuals at all relevant times acted on behalf of Defendant MASIMO within

18   the course and scope of their employment and/or agency.

19                              **GENERAL ALLEGATIONS**

20        **MASIMO's Violations of Federal and State Law**

21        11.     MASIMO (NASDAQ: MASI) is a publicly traded global medical technology

22   company headquartered in Irvine, California.  MASIMO describes itself in its marketing

23   materials as a company that develops and manufactures innovative non-invasive patient

24   monitoring technologies, including medical devices and a wide array of sensors for the devices.

25        12.     MASIMO develops and manufactures non-invasive technologies including

26   MASIMO SET pulse oximetry, for which MASIMO's devices are considered the "gold

27   standard" in the medical community.  The company's technologies also include Rainbow SET

28   Pulse Co-oximetry, and the recently introduced first-and-only FDA-cleared technology that

1     purports to measure total hemoglobin non-invasively, on a spot check basis. These spot check

2     hemoglobin devices are sold under the product names *Pronto* and *Pronto-7*. MASIMO also

3     markets and sells continuous hemoglobin monitors, including devices such as the *Radical-7*, the

4     *Rad 87*, and the *Rad 57t*.

5        13.     MASIMO used the Radical-7, Rad 87, and Rad 57t devices as "predicate" devices

6     to obtain speedy FDA approval of the Pronto, by claiming that the design of the Pronto was

7     "substantially equivalent" to that of the predicate devices (which shortens the FDA approval

8     process considerably).

9        14.     Specifically, to achieve a ruling from the FDA that the Pronto was substantially

10     equivalent, MASIMO stated to the FDA that the Pronto was "the same in design, principles of

11     operation, materials, and performance to" a MASIMO device called the *RadCheck*. MASIMO

12     had received FDA clearance on the RadCheck following representations by MASIMO that the

13     RadCheck was substantially equivalent to the Radical-7, Rad 87, and Rad 57t.

14        15.     MASIMO also stated to the FDA that the Pronto-7 was the same in all material

15     respects to the Pronto, and as a result, received FDA approval for marketing and sale of the

16     Pronto-7.

17        16.     The following are statutes and regulations setting forth public policies that

18     MASIMO has violated in its marketing and sales of the devices described above, including its

19     insistence that its TMs make false claims to physicians, hospital and clinical administrators, and

20     other device buyers when marketing and selling the devices.

21                  **Corporate and Criminal Fraud Accountability Act of 2002 (Sarbanes-Oxley**

22                  **Act), 18 U.S.C. § 1514A**

23        17.     Provisions of the Sarbanes-Oxley Act of 2002, Title VIII, Section 806 (Corporate

24     and Criminal Fraud Accountability Act of 2002), Pub. Law 107-204, Title VIII, section 806(a),

25     July 20, 2002, 116 Stat. 802, codified at 18 U.S.C. section 1514A, and its implementing

26     regulations, among other things, prohibit any publicly traded company or "any officer, employee

27     . . . or agent of such company" from taking any action to "discharge, demote, suspend, threaten,

28     harass, or in any other manner discriminate against an employee" who "provide[s] information

1  or cause[s] information to be provided . . . regarding any conduct which the employee

2  reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or

3  regulation of the Securities and Exchange Commission, or any provision of federal law relating

4  to fraud against shareholders, when the information or assistance is provided to . . . a person with

5  supervisory authority over the employee (or such other person working for the employer who

6  has the authority to investigate, discover, or terminate misconduct)."

7  ### Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15

8  ### U.S.C. § 78u-6(h) – Protection of Whistleblowers

9  18.   The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

10  Public Law No. 111-203, in section 922, codified in pertinent part at 15 U.S.C. section 78u-6(h),

11  provides anti-retaliation protection for employees who make disclosures that are required or

12  protected under the Sarbanes-Oxley Act and other laws, rules, or regulations under the

13  jurisdiction of the Securities and Exchange Commission.

14  19.   15 U.S.C. § 78u-6(h)(1)(A) provides in pertinent part that "[n]o employer may

15  discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner

16  discriminate against, a whistleblower in the terms and conditions of employment because of any

17  lawful act done by the whistleblower –

18  [***]

19  (iii) in making disclosures that are required or protected under the

20  Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.) . . . and any other

21  law, rule, or regulation subject to the jurisdiction of the Commission.

22  ### The Federal Mail Fraud Statute, 18 U.S.C. § 1341

23  20.   18 U.S.C. section 1341 defines the crime of mail fraud under federal law, and

24  provides in pertinent part: "Whoever, having devised or intending to devise any scheme or

25  artifice to defraud . . . for the purpose of executing such scheme or artifice or attempting to do

26  so, places in any post office or authorized depository for mail matter, any matter or thing

27  whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any

28  matter or thing whatever to be sent or delivered by any private or commercial interstate carrier,

1 or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by

2 mail or such carrier according to the direction thereon, or at the place at which it is directed to be

3 delivered by the person to whom it is addressed, any such matter of thing, shall be fined under

4 this title or imprisoned nor more than 20 years, or both. . . ."

5 **The Federal Wire Fraud Statute, 18 U.S.C. § 1343**

6      21.    18 U.S.C. section 1343 defines the crime of wire fraud under federal law, and

7 provides in pertinent part: "Whoever, having devised or intending to devise any scheme or

8 artifice to defraud, or for obtaining money . . . by means of false or fraudulent pretenses,

9 representations, or promises, transmits or causes to be transmitted by means of wire, radio, or

10 television communication in interstate or foreign commerce, any writings, signs, signals,

11 pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this

12 title or imprisoned not more than 20 years, or both."

13 **Federal False Claims Act, 31 U.S.C. § 3729**

14      22.    31 U.S.C. § 3729 (a)(2) states that any person who knowingly makes, uses, or

15 causes to be made or used, a false record or statement to get a false or fraudulent claim paid or

16 approved by the Government is liable to the United States Government for civil penalties unless

17 an exception applies. (See 31 U.S.C. § 3729(a)(7).) Under the statute, "knowing" and

18 "knowingly" mean that a person either has actual knowledge, acts in deliberate ignorance of the

19 truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the

20 information. (See 31 U.S.C. § 3729(7)(b)(1)-(3).) A "claim" includes any request or demand

21 for money or property, whether pursuant to a contract or otherwise, which is made to a

22 contractor, grantee, or other recipient if the United States Government provides any portion of

23 the money or property requested or demanded, or if the Government will reimburse such

24 contractor, grantee, or other recipient for any portion of the money or property requested or

25 demanded. (See 31 U.S.C. § 3729 (7)(c).)

26 **California False Claims Act, Cal. Gov. Code § 12651**

27      23.    California Government Code section 12651 states that a person who knowingly

28 makes, uses, or causes to be made or used a false record or statement to get a false claim paid or

1  approved by the State of California shall be liable to the state for three times the amount of

2  damages the state sustains because of the act of that person.  A person who commits any of the

3  following acts shall also be liable to the state for the costs of a civil action brought to recover any

4  of those penalties or damages, and may be liable to the state for a civil penalty of not less than

5  five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each false

6  claim.  (See Cal. Gov. Code § 12651(a)(2).)  Under the statute, "claim" includes any request or

7  demand for money, property, or services made to any employee, officer, or agent of the state or

8  of any political subdivision, or to any contractor, grantee, or other recipient, whether under

9  contract or not, if any portion of the money, property, or services requested or demanded issued

10  from, or was provided by, the state.  (See Cal. Gov. Code § 12650 (b)(1).)  Under the California

11  False Claims Act, "knowing" and "knowingly" mean that a person either has actual knowledge,

12  acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard

13  of the truth or falsity of the information.  (See Cal. Gov. Code § 12650 (2) (A)-(C).)  Under the

14  statute, "person" includes any natural person, corporation, firm, association, organization,

15  partnership, limited liability company, business, or trust.  (See Cal. Gov. Code § 12650 (b)(5).)

16  **Medicare & Medicaid Patient Protection Act, 42 U.S.C. § 1320**

17       24.      42 U.S.C. section 1320 states that whoever knowingly and willfully makes or

18  causes to be made:

19  • any false statement or representation of a material fact,

20  • in any application for any benefit or payment under a federal health care program, or

21  • at any time knowingly and willfully makes or causes to be made any false statement or

22       representation of a material fact for use in determining rights to such benefit or payment,

23  shall, in the case of such a statement, representation, concealment, failure or conversion by any

24  person in connection with the furnishing (by that person) of items or services for which payment

25  is or may be made under the program, be guilty of a felony, and upon conviction thereof, fined

26  not more than $25,000 or imprisoned for not more than five years or both.  Or, in the case of

27  such statement, representation, concealment, failure, conversion, or provision of counsel or

28  assistance by any other person, such person shall be guilty of a misdemeanor and upon

conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both.  (See 42 U.S.C. §1320 (a)-7(B).)  "Federal health care program" means any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.  (See 42 U.S.C. §1320 (f)(1).)

25.     42 U.S.C. section 1320 states that whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.  (See 42 U.S.C. §1320 (2)(B).)

### Conspiracy to Commit Offense or to Defraud United States, 18 U.S.C. § 371

26.     18 U.S.C. section 371 defines the crime of conspiracy to commit an offense against or to defraud the United States, and provides in pertinent part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

### Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1320d-6

27.     42 U.S.C. section 1320d-6 provides for various civil and criminal penalties for "covered entities" who violate HIPAA, or for others who "aid and abet" or "conspire" to violate HIPAA by, among other things, disclosing private health information without a patient's authorization.

### California Confidentiality of Medical Information Act, Cal. Civ. Code §56.10

28.     California Civil Code section 56.10, subdivision (d), provides in pertinent part that, absent consent of a patient, a provider of health care or a corporation shall not

1  "intentionally share . . . or otherwise use medical information for a purpose not necessary to

2  provide health care services to the patient."

3       29.    California Civil Code section 56.10, subdivision (e), provides in pertinent part

4  that, absent consent of a patient, a corporation shall not further disclose medical information

5  regarding a patient to a person or entity that is not engaged in providing direct health care

6  services to the patient.

7                **California Constitution, Article 1, Section 1**

8       30.    Article 1, Section 1 of the California Constitution provides that all people have a

9  right to privacy, among other inalienable rights.  The disclosure of a person's private medical

10  information without that person's consent constitutes a violation of this constitutional right to

11  privacy.

12            **California Business & Professions Code section 17500**

13       31.    California Business & Professions Code section 17500 provides that it is unlawful

14  for any corporation, with the intent to sell any product or service, to make any untrue or

15  misleading statement about the product or service, with actual or constructive knowledge of the

16  untrue or misleading nature of the statement concerning the product or service.

17            **California Business & Professions Code section 17200**

18       32.    California Business & Professions Code section 17200 provides that unfair

19  competition shall mean any unlawful, unfair, or fraudulent business act or practice and unfair,

20  deceptive, untrue, or misleading advertising and any act prohibited by Section 17500, *et seq.*, of

21  the Business & Professions Code.  Section 17203 of the Business & Professions Code provides

22  that a court of competent jurisdiction may enjoin any conduct constituting unfair competition

23  under Section 17200.

24        **California Health & Safety Code sections 119400 and 119402**

25       33.    California Health & Safety Code section 119402 provides in pertinent part that a

26  pharmaceutical company shall adopt a Comprehensive Compliance Program ("CCP") in

27  accordance with the April 2003 publication "Compliance Program Guidance for Pharmaceutical

28  Manufacturers," which was developed by the United States Department of Health and Human

1   Services Office of Inspector General, and shall update its CCP within six months of any revision

2   to the April 2003 publication.  Each CCP must include policies for compliance with the

3   Pharmaceutical Research and Manufacturers of America's "Code of Interactions with Health

4   Care Professionals," dated July 1, 2002, and shall make conforming changes to its CCP within

5   six months of the date of any revision to the July 1, 2002 publication.

6          34.    California Health & Safety Code section 119400, subdivision (c) defines a

7   "pharmaceutical company" as an entity that, among other things, is engaged in the production,

8   marketing, labeling, sale, or distribution of "dangerous drugs."  California Health & Safety Code

9   section 119400, subdivision (a), includes in the definition of "dangerous drug" any "drug or

10  device that, pursuant to federal or state law, may be dispensed only by prescription . . . ."

11         35.    MASIMO's aforementioned hemoglobin measuring devices, including the Pronto

12  and Pronto-7 and predicate devices, received FDA approval as devices that may only be

13  administered by a prescription.

### Pertinent FDA Regulations Applicable to MASIMO

15         36.    21 CFR section 803 states that manufacturers must report serious injuries that a

16  medical device may have caused or contributed to, and must report when a device has

17  malfunctioned and would be likely to cause serious injury if the malfunction reoccurred.  (See 21

18  CFR 803.1.)  A manufacturer is deemed to be "aware" of an event when any employee acquires

19  information that reasonably suggests a reportable adverse event has occurred.  (See 21 CFR

20  803.3(2).)

21         37.    21 CFR section 806 states that manufacturers are required to report any remedial

22  action other than routine maintenance or servicing of a device where such action is necessary to

23  prevent reoccurrence of a reportable event.  (See 21 CFR 806.1(a)(2).)

24         38.    21 CFR section 814 governs the regulations that pertain to a premarket

25  notification 510(k), a filing with the FDA that is needed before a device can be approved by the

26  FDA.  A premarket notification 510(k) filing requires proof that the new device is "substantially

27  equivalent" to another legally marketed device in the United States that already has FDA

28  approval (known as the "predicate" device).  "Substantial equivalence" means the new device

1  has the same intended use as the predicate and is at least as safe and effective as the predicate. A

2  device cannot be "substantially equivalent" if it raises new questions in regard to safety and

3  effectiveness." (See 21 CFR 807.92(a)(3).)

4       39.     21 CFR section 820 states that manufacturers shall establish and maintain a

5  quality system that is appropriate for the specific medical device(s) designed or manufactured.

6  Current good manufacturing practice ("CGMP") requirements are set forth in this section, and

7  govern the methods used in, and the facilities and controls used for the manufacture of, all

8  finished devices intended for human use.  Such requirements are intended to ensure that finished

9  devices are safe, effective, and in compliance with the Federal Food, Drug, and Cosmetic Act,

10  21 U.S.C. § 301, et seq.  A requirement is deemed to be "appropriate" if non-implementation

11  could reasonably be expected to result in the product not meeting specified requirements or the

12  manufacturer not taking corrective action.  (See 21 CFR 820.1(3).)  Each manufacturer is

13  required to maintain files of complaints received and to maintain procedures for receiving and

14  reviewing complaints.  Any complaint involving the possible failure of a device to meet any of

15  its specifications should be reviewed, investigated, and reported to the FDA if necessary.  (See

16  21 CFR 820.198.)

17       40.     45 CFR section 164, *et seq.*, provides extensive regulations concerning the

18  protection of private health information of patients.  45 CFR section 164.508(a) provides that

19  any disclosure of private health information requires an authorization by the patient or patient's

20  representative, except as otherwise provided by law.

21                 **PLAINTIFFS' EMPLOYMENT WITH MASIMO AND THEIR OBJECTIONS TO**

22                        **MASIMO'S UNLAWFUL AND DECEPTIVE ACTIVITY**

23       41.     On December 8, 2008, Plaintiff RUHE was hired by MASIMO as a TM in

24  MASIMO's Physician Office market.  Plaintiff RUHE's territory included a subset of southern

25  California, ranging north/south from San Diego to Orange County, and east to San Bernardino

26  and Riverside Counties.

27       42.     In Orange County, some of Plaintiff RUHE's larger customers and potential

28  customers for MASIMO's defective devices included such medical practice groups as *Pacific*

1  *Pediatrics, Talbert Medical Group, Gateway Medical Group*, and *Westminster Medical Group.*

2      43.    Some of Plaintiff RUHE's larger customers and prospective customers outside of

3  Orange County included *Loma Linda University Medical Center* in Loma Linda, and *Scripps*

4  *Health, Balboa Nephrology*, and the *Naval Medical Center San Diego* in San Diego.

5      44.    In January 2009, in a Limited Market Release, MASIMO launched the Pronto

6  device, which MASIMO claimed could be used to spot check total hemoglobin (SpHb), oxygen

7  saturation (SpO2), pulse rate, and perfusion index.

8      45.    The term "Limited Market Release," as used by MASIMO, meant a product

9  release in which the company attends trade shows and markets the product, but does not yet have

10 a fully developed, fully funded marketing procedure in place for the product.  During the

11 Pronto's Limited Market Release, MASIMO asked its customers to assess the Pronto device

12 during the early release stage, in exchange for a promise by MASIMO to "take care of" these

13 physicians later on, with software and hardware upgrades either at a substantial discount, or in

14 some cases, for free.  During this Limited Market Release, MASIMO charged up to $6,000.00

15 per each Pronto device.

16     46.    As TMs in the Physician Office market, Plaintiff RUHE was the first TM hired to

17 sell MASIMO's new Pronto device when it was released.

18     47.    TMs who sold the Pronto were instructed by MASIMO management to tell

19 physicians who asked about the accuracy of the device that it was within +/-1 g/dL of a verified

20 lab result.  In some of MASIMO's training and other materials given to TMs, MASIMO

21 provided additional accuracy specifications for the device, which stated that hemoglobin

22 measurements would be within +/-1 g/dL of a verified lab result 68% of the time (1st standard

23 deviation), within +/-2 g/dL of a verified lab result 95% of the time (2nd standard deviation), and

24 within +/-3 g/dL of a verified lab result 99.3% of the time (3rd standard deviation).  The

25 remaining 0.7% of the time included anything more than +/-3 g/dL off of a verified lab result (4th

26 standard deviation).  These statistics were MASIMO's official, stated accuracy specifications

27 that MASIMO has used to market and sell the Pronto and Pronto-7 devices, as well as the

28 Radical-7 device.

48.     Plaintiff RUHE and the other TMs were repeatedly instructed that when they sold the Pronto devices, they should use MASIMO's established reputation as the "gold standard" in pulse oximetry measurement to lend credence to MASIMO's new, non-invasive, hemoglobin measuring devices.  Furthermore, when discussing the Pronto device, TMs were instructed to use the data from MASIMO's Radical-7 device (a predicate device to the Pronto and Pronto-7, the FDA clearance for which Plaintiffs are informed and believe to have been based on a questionable, cherry-picked clinical study).

49.     In January 2009, the Pronto units given to TMs as demo units frequently produced measurements that were equal to or greater than +/-3 g/dL off of the verified lab values determined by a blood draw from the patient (the traditional, proven method of measuring hemoglobin).  These frequent, significant inaccuracies from the Pronto were a serious problem, because readings that are more than 3 g/dL off of the accurate value are outside the 3rd standard deviation in the claimed accuracy specification, and under the claimed accuracy specification, errors of this magnitude were supposed to happen only than 0.7% of the time.   MASIMO TMs dutifully reported these inaccuracies to MASIMO management.  Instead of taking these reports seriously, MASIMO's management blamed the inaccuracies on "TM error," and crafted other convenient, often fanciful, sometimes bizarre, excuses for why the devices were not functioning properly.  These excuses included blaming device malfunctions on ambient lighting in the room, ambient and hand temperature, electrical or cell phone interference, or altitude.

50.     During this time, Plaintiff RUHE discussed his concerns regarding inaccuracy with his Regional Manager, John Birkle, who stated, "It really doesn't matter, because it's not for us to decide.  We still have to sell it."

51. Plaintiffs are informed and believe and thereupon allege that when accuracy problems began to mount for the noninvasive SpHb testing product line, MASIMO CEO Joe Kiani personally headed up the product review meetings for the Radical-7, Pronto, and Pronto-7, and had full knowledge of all of the problems with device inaccuracies, but continued to insist that the company sell the devices to health care providers anyway, because he wanted to be first to market.

52.     In mid-January 2009, MASIMO management, including Birkle, Gary Marston (Head of Marketing), and Kevin Hammond (V.P. of Sales in the Physician Office market), began instructing TMs to "spin" the standard deviation explanation to physicians by claiming that any confirmed inaccuracies were simply rare outliers, and that such inaccuracies did not take the device out of the company's claimed accuracy specification.

53.     TMs were instructed by management to keep conversations brief when speaking with physicians during sales calls regarding accuracy problems. Employees were encouraged to discuss the 1st standard deviation openly (i.e., to emphasize that the device was accurate to within 1 g/dL of the lab value), but not necessarily the 2nd or 3rd standard deviations if it could be avoided. When management traveled in the field with the TMs and were asked by physicians about accuracy, they would often give the incomplete answer "plus or minus 1 g/dL," neglecting to acknowledge the 2nd and 3rd standard deviations at all. Management also instructed TMs to tell physicians that "the accuracy of the Pronto was comparable to the Hemocue [the industry leader in invasive hemoglobin monitoring, requiring a needle stick] or even better."

54.     In March 2009, a MASIMO TM reported that the Pronto gave grossly inaccurate readings in high altitude locations. MASIMO, however, instructed its TMs to tell clinicians that altitude did not affect the Pronto's ability to produce an accurate reading. Instead, MASIMO continued falsely blaming device inaccuracies on operator error and accusing TMs of misplacing Pronto sensors on patients' fingers.

55.     On March 23, 2009, MASIMO hired Plaintiff CATALA as a TM for the greater Los Angeles area, north to San Luis Obispo, and the southern Central Valley area markets. Plaintiff CATALA's official title was "Territory Manager," and later changed to "Territory Hemoglobin Specialist," along with every other TM in the Physician Office market. His job responsibilities were identical to those of Plaintiff RUHE and the other TMs.

56.     In or about April 2009, during Plaintiff CATALA's intial job training meeting, a training meeting attended by the entire Physician Office sales force, he and many other TMs were SpHb tested using the Pronto and observed that the results produced by the device were drastically different from lab results obtained through conventional invasive blood testing in

1    close temporal proximity to the Pronto results.  The Pronto results for Plaintiff CATALA and

2    two other TMs were greater than 4 g/dL off their respective lab values, results that should occur

3    only 0.7% of the time.  MASIMO blamed Plaintiff CATALA's "body chemistry" for the

4    inaccurate results.  Paul Jansen (MASIMO's Executive Vice President of Marketing and Clinical

5    Development) and Marston stated that they "had never seen that kind of behavior with the

6    device," and Marston joked that Plaintiff CATALA must be a "freak of nature" because the

7    device was not working on him.

8         57.    At this same meeting, one of the TMs stated that the Pronto was producing

9    inaccurate results, especially on medium to darker skin tones.  Jansen replied, "We have NEVER

10   seen inaccuracies like this before," and then blamed the overhead projector and cell phone

11   interference in the room for the inaccurate results (a strange claim to make for a device

12   supposedly designed to operate in environments filled with other electrical equipment and

13   medical devices).

14        58.    In early April 2009, Joe Kiani (MASIMO's CEO, Co-founder, and Chairman of

15   the Board) spent a day in the field with Plaintiff RUHE as he made sales calls on physicians'

16   offices.  CEO Kiani saw firsthand that the Pronto was inaccurate during in-office

17   demonstrations.  In one Orange County physician's office, the office manager (who stated that

18   she had been medically confirmed as chronically anemic) was tested using the Pronto device,

19   which produced a "false negative" result, where her hemoglobin reading incorrectly indicated

20   that she was not anemic.  CEO Kiani invited her back to MASIMO's corporate office for

21   additional testing and research and explained that she was an ideal subject because she was

22   young and anemic, but otherwise healthy.  He said subjects with that profile can be difficult to

23   find, and that sometimes anemic status in research subjects must be simulated through

24   hemodilution.  After leaving the office, CEO Kiani asked Plaintiff RUHE how often he

25   experienced such extreme inaccuracies.  Plaintiff RUHE responded, "unfortunately, a few times

26   a day."  CEO Kiani asked RUHE how many returns he expected to receive based on

27   performance issues.  RUHE told Kiani that based solely on the complaints he had received thus

28   far, he estimated at least one-third and possibly one-half of Pronto devices sold could be returned

COMPLAINT

1   due to concerns about poor performance.

2       59.    During the same field travel day, CEO Kiani discussed device accuracy with

3   Plaintiff RUHE. He told Plaintiff that he should seek out customers who want to be "partners of

4   ours." CEO Kiani said that customers need to recognize that the Pronto is not yet perfect and

5   suggested that Plaintiff RUHE make it clear to physicians that MASIMO is seeking users who

6   will provide important feedback necessary for MASIMO to fine-tune and further develop the

7   Pronto.

8       60.    Around April 2009, inaccurate Pronto SpHb readings continued to accrue at an

9   alarming rate, and MASIMO's executive management became more defensive. Instead of

10   adressing the accuracy problems in a responsible way, management suggested that TMs "bag

11   fingers" (place a black bag over a patient's finger to shield it from surrounding light). When

12   complaints of inaccuracy arose, management would ask, "Did you remember to use a black

13   bag?" Large quantities of black bags were shipped out to TMs to be distributed among

14   customers and prospects for use while testing the devices. More than a year later, Gary Marston

15   confirmed in separate "off the record" conversations with two TMs that, as far as he could tell

16   by looking at the data, there was no clinical significance to the black bag, in terms of how it

17   affected an SpHb reading.

18       61.    Also around April 2009, a TM reported to Birkle that one physician did not want

19   to purchase the Pronto because it was overpriced. Birkle suggested that the TM "pay him" (the

20   physician) under the table to push the sale. Birkle then chastised the TM for pointing out that

21   such behavior was unethical and illegal.

22       62.    In approximately April 2009, Birkle also told Plaintiff RUHE that he should "do

23   whatever it takes" to make a sale, including doing favors for or offering "spiffs" to distributor

24   representatives. The implication to Plaintiff RUHE was clear that he was to offer distributors

25   and their sales representatives cash bonuses under the table in exchange for sales and/or leads

26   that could ultimately turn into sales.

27       63.    In response to numerous complaints of inaccuracies from the field, MASIMO's

28   co-founder, Mohammed Diab, several MASIMO engineers, and two MASIMO corporate

Product Managers, Jay Hachey and Loree Boldman, met with Plaintiff RUHE at MASIMO headquarters in Irvine. The purpose of the meeting was to watch Plaintiff RUHE demonstrate the inaccuracies he was experiencing and to show them his testing technique so that they could ensure that his technique was not causing the accuracy problems he was reporting. Using his field demo Pronto device, Plaintiff RUHE ran a number of SpHb tests on most or all of the attendees at the meeting to demonstrate how non-reproducible Pronto results were. The device produced wild swings in SpHb measurements on all of the test subjects, and included numerous variations of +/-3 g/dL, or greater, from the same subjects from tests taken mere minutes apart. The MASIMO corporate attendees were largely silent during this meeting, except when Diab told Hachey to plug Plaintiff RUHE's Pronto sensor into a MASIMO computer to record several additional readings from attendees and from other MASIMO passersby. These results, too, were wildly inaccurate. When Plaintiff RUHE and Hachey spoke after the meeting, Plaintiff RUHE asked whether Hachey thought that Diab and the engineers had seen how poorly the device was performing, because Diab had been so nonchalant during the meeting. Hachey replied, "Yeah, they sure did. They just weren't going to admit that." After this conversation, Plaintiff RUHE never heard another word about it from Diab, Hachey, or anyone else at MASIMO.

64. In May 2009, Plaintiff RUHE conducted device evaluations in three physicians' offices and compared the results of the Pronto and Radical-7 SpHb measurements against conventionally obtained lab values. The mean variances rendered by the Pronto and Radical-7 when compared to actual lab values were greater than +/-2 g/dL at all three offices. Per instructions from Marston, Plaintiff RUHE saved these results to an SD flash card and sent them via FedEx to Marston.

65. Also in May 2009, CEO Kiani attended the PriMed West 2009 Conference and Exhibition, and after seeing with his own eyes that the Pronto was returning wildly inaccurate readings and that doctors were laughing at the device, left the showroom floor in embarrassment. Later, while sitting at the hotel lounge, Marston, Jansen, and Hammond admitted to Plaintiffs RUHE and CATALA that there were accuracy concerns about the Pronto at the upper levels of MASIMO management. Jansen called MASIMO's headquarters and asked for a team of

1    engineers to come to the PriMed show the following day to witness the inaccuracies.

2        66.    As the records of inaccuracies mounted, Plaintiffs RUHE and CATALA voiced

3    their concerns to Birkle, Marston, and Hammond.  Birkle, Marston, and Hammond told Plaintiffs

4    RUHE and CATALA to "spin" the standard deviation explanation by telling doctors that any

5    obvious inaccuracies were simply rare, statistical outliers, and that the majority of results were

6    accurate.

7        67.    During this time, Plaintiffs and the other TMs were also instructed to talk about

8    the device being accurate to within 1 g/dL, and not to talk about results outside of this 1st

9    standard deviation unless in response to a specific complaint about accuracy.

10       68.    In July 2009, two cases at the Intermountain Medical Center in Colorado

11   produced SpHb readings which were +/-6 g/dL off of the actual lab values.  Gary Clawson,

12   (MASIMO's director of Clinical and Professional Development) admitted that MASIMO had no

13   idea why Pronto produced major outliers such as these.

14       69.    In July 2009, MASIMO finally recalled the Pronto device following the

15   disasterous May 2009 PriMed West show.

16       70.    In July 2009, MASIMO held a division-wide Physician Office market meeting in

17   Irvine.  During this meeting, MASIMO's Executive Vice President of Marketing, Paul Jansen,

18   admitted to the TMs in the division that inaccuracies that are beyond +/-2 g/dL of SpHb (on the

19   Pronto) "will kill you in a spot check device" in terms of physician acceptance, but are more

20   acceptable with a continuous monitor such as the Radical-7.  This is because, according to

21   Jansen, the "real clinical value" in a continuous monitor is the "trending" line (up, down, or

22   stable) of a patient's hemoglobin value over the course of time.  This statement, that the "trend"

23   was what mattered on continuous measurement devices, was contrary to the accuracy spec of the

24   Radical-7, which was the same as, and formed the basis of FDA approval of, the Pronto and

25   Pronto-7.

26       71.    As a result of MASIMO's recall of the Pronto in July 2009, Plaintiffs and the

27   other TMs suddenly had no product to sell.  MASIMO transitioned its Pronto TMs into the acute

28   care setting and asked them to sell the Radical-7.  Because the Radical-7 had similar inaccuracy

1   issues to those experienced with the Pronto, Plaintiffs RUHE and CATALA were instructed to

2   focus on the "trending" aspect of the Radical-7, instead of the actual SpHb number the device

3   produced, when making sales calls.  Plaintiffs and other TMs were also instructed to return

4   recalled Pronto devices to at least one physician in each of their territories, and to ask the

5   physicians to keep the devices in their offices but not to rely on them for making diagnostic

6   decisions, so that MASIMO would not have to report the voluntary recall to the FDA.

7       72.   Around November 2009, Plaintiff RUHE was selected by Birkle to represent the

8   western region on MASIMO's "Continuous SpHb Core Team" (CSCT).  This team comprised

9   clinical specialists and TMs from various divisions and regions throughout the country.  The

10   team assembled monthly via teleconference.  Dan Draper (Marketing V.P.) was the host and key

11   facilitator.  One of the main purposes of the CSCT was to "generate graphic reports to

12   demonstrate the power of the SpHb trend graph to our prospective customers."  During

13   scheduled teleconferences, the CSCT members would grapple with the more difficult and urgent

14   cases and questions from the field, many of which went unanswered because there were no

15   explanations other than that the devices were simply failing.  Within a few months of Plaintiff

16   RUHE joining the team, the CSCT was quietly disbanded.  Plaintiff RUHE was never informed

17   why this occurred.

18       73.   In December 2009, Plaintiff RUHE was at a major university medical center,

19   conducting general follow-up regarding the Radical-7.  A highly respected physician who was a

20   professor at the university stated to Plaintiff RUHE that he (the physician) should be "put on the

21   MASIMO payroll for acting as damage control for the [Radical-7] device," because there were

22   so many questions about apparent inaccuracies during operating room cases.  This physician then

23   explained to Plaintiff RUHE how he often had to spin the "trending" explanation to his peers in

24   order to explain away the devices' inaccuracies.  This physician also stated that he didn't believe

25   the Radical-7 was accurate on patients with jaundice, and that there was no acknowledgement in

26   any of MASIMO's literature as to limitations on specific patient populations, such as those

27   suffering from jaundice.  Plaintiff RUHE reported this physician's concerns to Marston publicly,

28   during a national, division-wide conference call.  Marston promised to get back to Plaintiff

1    RUHE about this, but then never did.

2         74.    During the time that the Pronto TMs were assigned to sell the Radical-7,

3    numerous customers raised concerns about the accuracy of the Radical-7's continuous SpHb

4    measurement function, upon which the Pronto and Pronto-7 accuracy specs were based.

5    MASIMO management responded to such concerns with a new internal marketing slogan:

6    "Trend is your friend," meaning that physicians should focus not on the numerical SpHb reading

7    given by the device (because it could be quite inaccurate far more frequently than the accuracy

8    spec indicated), but on whether the SpHb level was going up, down, or staying level over time.

9    TMs were coached to use this slogan and remind customers to essentially disregard the actual

10   SpHb reading that appeared on the Radical-7 monitor, but to instead focus on the SpHb trend

11   over the course of a continuous measurement.  This marketing strategy was not consistent with

12   what MASIMO was representing in its Radical-7 accuracy specification.  Although Plaintiffs

13   only spent approximately four months selling the Radical-7, they observed enough accuracy

14   problems during that time to raise serious doubts in their minds as to the claimed accuracy

15   specification of this predicate device to the Pronto and Pronto-7 devices that Plaintiffs had been

16   hired to sell.

17        75.    In Q1 2010, MASIMO pulled Plaintiffs and the other Pronto TMs off of the

18   Radical-7 sales project and instead paid them their full salary and guarantees of approximately

19   $11,000.00 per month to locate and retain physicians to act as Principal Investigators on

20   Independent Review Boards for MASIMO.  This constituted a significant outlay of cash for

21   MASIMO to pay all of its TMs, who were device salespeople and not trained and qualified

22   clinical research associates.  Most of the TMs who were paid this money during this quarter did

23   not retain a single physician as a Principal Investigator, and yet, oddly, MASIMO management

24   did not seem to care.  Plaintiffs are informed and believe and thereupon allege that MASIMO

25   retained its Pronto TMs as "window dressing" for Wall Street, so that it could provide false

26   assurances to investors and Wall Street analysts that, despite the looming expiration of

27   MASIMO's patents on its pulse oximetry devices, it had its "next big thing" in its spot checking

28   hemoglobin devices.